May it please the Court, Scott Hunt appearing on behalf of Appellant Mitch Brown. In this ADA failure to accommodate and discrimination case, the lower court erred on all four of the major issues before it and simply did not address two of the others. In the first instance the court held that the leave of absence that plaintiff needed was only approximately seven weeks or in the court's phraseology short term and therefore his underlying impairment or depression was short term and therefore he wasn't disabled. However, the record establishes that the impairment, the depression, lasted from at least November 2001 through the then present November 2003 present in the record. What about his sign up for unemployment benefits saying he was fit for duty on January 8, 2002? Right. A disabled person needs to be able to work in order to meet the essential functions of the job. To assert that he's able to work doesn't assert that his underlying impairment, the depression, ceases to exist. Well, the major life activity which was impaired by his claimed disability was work. No, no. The include work. CORE, the defendant's insurance carrier that provided short term disability benefits, analyzed whether the individual plaintiff was unable to work in determining whether he was entitled to short term disability benefits, but this is an ADA case, not an limits him in one or more major life activities. Not necessarily work. What major life activity does it impair him in? Under the record in this case, very similar to the recently decided Head v. Glacier Northwest case that was cited in our supplemental materials to the court, the major life activities included sleep, inability to interact with others, thinking and concentrating, reading, which was recently held by this court to be a major life activity in the head case, and ability to care for himself. None of those factors or major life activities. And the record in this case establishes, very similar to the head case and the McElindan case, that the plaintiff was unable to sleep at times due to his depression, up days at a time, or in the alternative, sleeping hours all day to the exclusion of other activity. His inability to interact with others was demonstrated in this case. That was the central issue. Mr. Brown was so incapacitated that he had to have others act on his behalf. Didn't the district court make a determination that his problems were temporary? Yes. They weren't of a sufficient duration. Precisely. To be considered a disability under our precedent. He relied on the request for leave and the length of that leave to determine the impairment itself was short term. But that's the wrong analysis. The leave is a request for a short term reasonable accommodation. The underlying impairment, depression, in the record before the court, is that he had suffered from it for years. He was diagnosed with it in November of 2001. Experienced a seven week to two month period he was unable to work. Was diagnosed by a different doctor one year later, November of 2002, where once again there was a one month period. Only in that case the employer accommodated that leave and he was able to return to work. In this record he continued to experience and suffer from the depression as of March 2003 when his deposition was taken and as of November 2003 when the summary judgment materials were submitted. At that point he was still presently suffering from depression. So on the record before the court it is a minimum of a two year impairment but again it's through the then present. So I would argue it's long term or permanent. It is not a seven week impairment if the depression lasts for a period of years. When did he make some, I'm recalling he made a certification for unemployment and he was able to work. So how do you reconcile that with your depression? Well to be entitled to a reasonable accommodation and do the work, a person with depression has to be able to work. If he's unable to work, period, he's not qualified, otherwise qualified to do the essential functions of the job. The ADA imposes the necessity that you're able to work. What it establishes that you're entitled to a reasonable accommodation to do that work. And the reasonable accommodation here is not to work. No, well. For a while. Precisely. As this court has held is a reasonable accommodation of both Nunez and Humphrey. But to follow up on what Judge Gould was saying, his certification that he was ready and able to work at that time. The certification was that there was no substantial barrier to his ability to work. And isn't that inconsistent with him having a disability from work without a reasonable accommodation? No. Well suppose he went to the unemployment agency and said I want my benefits, I'm ready to work, but I can't work. Well then he wouldn't get his benefits and that would be inconsistent with the ADA. But he didn't say that, he said I'm ready to work. Right. I don't need a reasonable accommodation, I'm ready to work. As of January he didn't need continued leave. He didn't need leave in January. He was ready to work. Right. Work is not the major life activity in question in the case. Work was never pleaded as a major life activity in this case. The major life activities are the ones I listed. The fact that the Criado case, the first circuit case that we cite in the materials, is very close to being right on point. The depression in that case had lasted for a period of seven years. The plaintiff in that case, for the first time, needed time off work. The fact that the plaintiff only needed a few weeks off work, in that case four weeks, but was terminated after being off two weeks, was not held to mean that the underlying depression didn't exist, that he wasn't disabled due to that depression due to the way it affected his sleep, in that case it was her sleep, interaction with others, or caring for themselves. The court needs to separate the reasonable accommodation analysis from the disability analysis as the court has done in Macklin and other ADA cases. What significance, if any, do you give to the varying versions of why he had objective symptoms of depression? One, given by your client, was that his girlfriend had left him when he was in severe depression. Another was that his uncle had died, which didn't occur apparently. And a third, by the girlfriend, was that he was a binge drinker. Now, does credibility factor into the depression analysis at all? Not at summary judgment, your honor. Certainly to the jury, the issue of binge drinking may be a very persuasive argument, but we're at summary judgment. And at summary judgment, the truthfulness of the record as established by the plaintiff and all reasonable inferences in his favor must be presumed. The fact that before he seeks medical help, he asserts that he's off work due to his uncle dying doesn't negate that he later is diagnosed with severe depression. Severe depression is the diagnosis, and that's what the defendant is told. Severe depression. When he asks, what exactly are we dealing with, Mr. Allison, I'm sort of switching to the request for reasonable accommodation analysis. When Mr. Allison, the defendant's supervisor, asks Mr. Peterson, plaintiff's representative, who is acting on his behalf because he's incapable of communicating himself, communication being a major life activity. He's having other people take care of his affairs for him because he's so incapacitated. In that first interaction, when Mr. Allison asks, what exactly are we dealing with, he is told explicitly a severe situation involving severe depression, and that Mr. Brown needed help, wanted help, and was seeking help. That was putting the defendant on notice of the medical condition, depression, and asking for a modification, time off work, which is exactly what this court has stated in Barnett, is what an employee is to do in requesting a request for an accommodation. Did he ever ask for an accommodation? Yes, through Mr. Peterson, repeatedly. He never himself asked for an accommodation? He never himself directly in person asked, and this court has recognized in Barnett, following the regulations under the ADA, that you can ask for an accommodation through a representative, as he did. You say his friend's call is a request for accommodation? Absolutely. Under Barnett, this court has stated that you identify the medical condition, and you ask for a modification, and that triggers the obligation by the employer to engage in the interactive process. What was Mr. Peterson's, what did he say Mr. Brown's problem was? Severe depression. A severe situation. That's what he told Verizon. Right, which was later confirmed by doctor's notes. Depression, time off needed for depression, diagnosis depression, diagnosed in November 20th, diagnosis December 5th, depression, anxiety. My question was, what was the communication? That was all communicated to Verizon. Every one of those? Every one of those. Diagnosis. Every one of them. Do you see any significance in the fact that the doctor cut off his disability in early December, and rather than go to the doctor again, he went to a nurse practitioner, not a plaintiff? The fact that the doctor operates his counseling should not be held against my plaintiff. The fact that he saw a nurse practitioner doesn't negate the notice to the defendant that he needed additional time off as certified by that nurse practitioner. But you raise a point that needs to be clarified in the record. There is a disputed fact that defendant asserts as fact. Defendant asserts that plaintiff's doctor, Dr. Mendelson, authorized his return to work, that his leave was not necessary after December 10th. That is based on core, the insurance carrier's log of a conversation between its subcontractor, Dr. Hartman, and my client's doctor, Dr. Mendelson. I objected to it as hearsay. What Hartman said, Mendelson, no ruling in the lower court. It's within my concise statement of facts the objection is on the basis of hearsay. Assuming it gets in as a business record, there is a conflicting business record, and that is Dr. Mendelson's own record of that conversation that took place on November 19th. And in that record, in that statement, which is Brown Exhibit 35, it's in the excerpts of the record at page 320. In that record, of Dr. Mendelson's notation of the conversation, he simply says that he has extended plaintiff's time off to December 10th, and notes that Dr. Hartman will proceed. Dr. Hartman indicated he will process this as patient is expected to return to work 12-10 or thereabouts. There is no concession, there is nothing in the record that says Dr. Mendelson, plaintiff's doctor, says he can return to work December 10th. And no more, he's released to return to work, no more need for leave. The record is that he extends it through the 10th, recognizing it may be later or thereabouts, and that subsequently, the nurse practitioner, another health care professional, treating my client, which may be disregarded by CORE, the insurance provider, because under its contract, it can ignore a non-licensed doctor. But under the ADA, the defendant does not have that luxury. Under the ADA, it had notice from my client's treating medical professional that he needed an extension of leave from December 10th all the way through to December 23rd, 13 more days. And instead, he was terminated December 20th, because as defendant stated, CORE had determined his short-term disability benefits were no longer continued. Those are apples and oranges. CORE is not, in the record, CORE did not make ADA determinations. In the record, that was done by a separate agency of Verizon, and this case was never referred to it. Defendant had notice of the severe depression, knew of a request for an accommodation of leave. The impairment lasted for years after the need for that short-term accommodation, and the defendant failed to engage in the interactive process, simply sent my client to CORE, despite Mr. Peterson's repeated, in the record, hounding of Ken Potts that he needed something more than short-term disability. He may need a little more time, something like a leave of absence, et cetera. I'd like to reserve the rest of my time for rebuttal, if I may. May it please the Court, Charles Adams for Verizon, the defendant. I think of this case involving a donut. The center of the donut is the facts disclosed to Verizon during this period of November through December of 2001. The outer circle of the donut is the quantum of facts never disclosed to Verizon at any point during this continuum. Let's focus on the center of the donut. You bet. The center of the donut starts with plaintiff on October 12th calling in, leaving a voicemail saying his uncle has died. Then in the period between October 15th and October 28th... Is there any dispute that the uncle did die? It is undisputed that the uncle did not die. It was not true. Happily, the uncle survives. Between October 15th and 28th, plaintiff again didn't come to work on several days. A check by his supervisor, Jim Allison, of his work records didn't show any completed transactions during that period, making Verizon skeptical whether indeed he was making work calls as he claimed to be. On the 29th, and plaintiff himself conceded below that this was the first time there was any indication of a possible health problem on his part, on October 29th with his supervisor, reporting that he's broken up with his girlfriend and he asks for personal leave. That's the last communication, at least orally, by plaintiff initiated with anyone from Verizon. The only other communication from plaintiff is a letter which comes to Verizon on November 5th, a letter signed by Brown. And the letter says, it reports, I thank you for being understanding during this difficult time. And then the letter says, and I'm quoting now from Excerpt of Record 353, I, Mitch Brown, am looking forward to returning to Verizon in the near future. That's the end of the communications from Brown himself. We now know, and this relates to plaintiff's own circumstance at the time, we now know from later depositions, plaintiff himself concedes, and this is in the Excerpt of Record 57, he was not disabled in July 2001 when he went to work for Verizon. Those are plaintiff's own words. You'll find that in the Excerpt of Record, page 57. I'm sorry, I must have said that again. Excerpt of Record 57. No, I said what you said before. That Brown concedes he was not disabled in July of 2001 when he was hired by Verizon. In the Excerpt of Record at 30, you will find Brown acknowledging, and again I'm quoting, that his October to December 2001 illness experience was, and I'm quoting, his initial, initial debilitating bout of depression. That's at ER 30. And then finally we know from the certification given he gave to the Unemployment Board in January of 2002, this is less than three weeks after he's been, after he's left employment with Verizon, he attests that he's ready to work full time, and he attests that he, that he is capable of working. We also then have to take a look at Scott Peterson, who stepped up to try to help his And as Mr. Hod has accurately reported, Peterson says to Verizon's representative, Mr. Allison, that plaintiff was seriously depressed, it was a serious condition, and it was severe. Peterson does use those words. At the same time, Peterson takes pains to say this is a short-term situation. You'll find that in the Excerpt of Record at 30. In fact, wanting to make the point that this is short-term, that Mr. Brown will be back to work soon, Peterson then writes a letter to Potts, who's in Seattle, HR with the company in Seattle, and in that letter, in his own capitalized bold letters, Peterson writes that he was extremely clear in communicating to Allison in the Portland office that Mr. Brown's period of not coming to work was going to be quite short. Peterson also testified that he copied Verizon on clinicians' reports. These are reports compared by Dr. Mandelblatt, Plaintiff's personal care physician. Peterson says that he copied those to Verizon during this period when there were a series of these clinicians' reports sent in to CORE, and CORE, it's important to keep in mind, was a third-party provider. It's not Verizon. It's a third-party entity that handles short-term disability experience. When you look in these notes, you do not find anywhere the word serious or severe referred to in describing the medical condition. The notes do, from Mandelblatt, do mention depression, but they also describe it as an acute medical condition. What's the difference between acute and severe? Acute being, and this ties back to Peterson's representation, that Allison, that this situation, why severe, was also going to be short-term. It communicates to CORE. Acute means sudden onset as opposed to a chronic onset. Coupled, though, with what Peterson had said, it is reasonable to infer, if you're Verizon, on the end of receiving that information, that we're talking here about someone being able to come back to work soon. That inference is then supported when Verizon receives the information from CORE, having seen these doctors' reports, where CORE says, indeed, this fellow's limitation is short-term. They communicate that to Verizon. Based on Verizon, Verizon sets the December 10 return date. And I would like to touch also on the notes of the conversation between Dr. Mandelblatt that were referred to. That's in the Extractive Record at 320. And the mirror image notes of that same conversation by the psychiatrist, Dr. Hartman, who talked with Mandelblatt. This is around November 20. As Mr. Hunt read correctly at the end of the notes kept of that conversation by Dr. Mandelblatt, Mandelblatt says, quote, Dr. Hartman indicated that he will process this as patients expected to return to work 12-10 or thereabouts, close quote. If Mandelblatt thought that was inappropriate as a treating physician, if he thought it was wrong, if he disagreed with it, he would have said something. He didn't. And Hartman's notes offer the mirror image of that. Hartman's notes you can find in the supplemental Extractive Record 441. You put those two documents together, and you have the complete conversation had between the two. Back then to the donut, the core of information given to Verizon was not enough to alert them that what they had here might potentially be an ADA disability. What they believed this was was a short-term incapacity. Everything sent to them confirmed it. They didn't know about plaintiff's pattern of alcohol abuse. They didn't know, according to Tanya Shriver, that he had 36 doctor's appointments in 45 days. They didn't know that he was having trouble sleeping or concentrating or reading. All that they knew was that he wasn't coming to work, and they could infer, or well, they might infer from Peterson's involvement that Brown was having some problem at the time of relating to people and communicating. They also knew from Peterson. They also knew from Core that this was a short-term situation, and that's what it was. The Core problem here, and the trial judge recognized it, is that while there's evidence of an impairment in this case, depression, what there is not is evidence sufficient to find an ADA disability. Why? Because of duration. This condition simply did not last long enough at the time the decisions were being made by Verizon to make this an ADA disability. And that is why, by the way, Verizon did not, within its own structure, ever involve its own ADA compliance group. There is within the company an entity that deals with these issues. The facts presented to them just simply didn't present, didn't raise on the radar screen as a possible ADA issue. And related to that as well, the pattern between Core, the third-party outside provider, and Verizon was, even though all Core did was handle short-term disability, Core did not make, as Mr. Hunt correctly describes, Core does not make ADA decisions. What Core does do is it alerts Verizon when a disability is expected to last longer than three months. No such alert was ever given here. What's the magic of three months? That it could trigger within Verizon, wait a minute, this may be long-term. We may be looking at an ADA disability. Are there any cases which say in the Ninth Circuit that a temporary or short-term disability is not considered an ADA disability? There is, and I walk them on the name of the case. We have a case in our brief that talks about the period of time as being relevant to deciding whether what you've got is an ADA disability. Duration matters? Yes. Duration does matter in deciding whether what you've got qualifies as an ADA disability. Is the case that the district judge relied on standards via harness? Yes. At ER 10. So if I look at these clinical reports, and I understand acute means it's different from chronic, but you have a series of communications combined with a third-party friend calling in and saying he needs more time. And the last, at least, of these clinician reports that I have here is saying the diagnosis has moved from acute medical conditions to depression and anxiety. You're saying that that is not enough to put Verizon on notice that they're dealing with something more than just a transient short-term problem? As a matter of law, it is not sufficient because what they then hear from CORE is that the personal physician, his own doctor, has approved him going back to work December 10. Well, but counsel's arguing that the major life activity isn't work, but the issue is that he has an underlying disability that manifests itself in inability to get to work. And none of the information about him having problems, anything other than work and possibly evidencing his transient difficulty in communicating with other people, none of that information was made known to Verizon. He has depression. Right, but they are told he's having trouble with sleeping, reading, concentrating, any of that. Okay. And by January 8, as we know, he certifies that he's ready to go back to work. He's ready to work full-time. All right. Thank you. Thank you. You have about three and a half minutes. Thank you, Judge. Let me address the donut as well, because what Verizon knows under Barnett and Humphrey and this CORE's precedent is exactly what's needed to trigger the obligation to engage in the interactive process. And had Verizon engaged in the interactive process, rather than farming it off to its short-term disability insurance carrier, it would have been able to obtain and get the information that it now asserts it never had. The whole purpose of the interactive process. Get to what it is. Okay. What it is is that it is acute. It is sudden. It's severe depression. That's what he's told. Where's severe? Severe is from Peterson. And it's repeated as severe three times by Peterson to Allison. That is confirmed by medical documentation, which the employer has a right to receive but chose to ignore. The fact that Mendelblatt, on November 20th, may or may not have authorized his return to work, our position is he merely extended his time off work through that period and recognized CORE would treat it as through that period or thereabouts. So there is a fundamental question of fact for the jury to decide what Mendelblatt did or did not confirm at that time. But whether or not Mendelblatt did that, as to the situation Verizon didn't know, is that as of December 5th, there was additional new medical documentation stating that plaintiffs needed time off not through the 10th of December but continued on through the 23rd of December. And it wasn't due to just depression. It's now due to depression and anxiety. That's what they knew. And it's their obligation under Barnett, the language is, at 11-12, an employee requesting a reasonable accommodation should inform the employer of the need for an adjustment due to a medical condition using plain English and need not mention the ADA or use the phrase reasonable accommodation. That's this court's precedent. That's exactly what plaintiffs did through Mr. Peterson and his doctors by informing Verizon of a severe depression that required a short-term leave of absence. Interestingly, on oral argument, defendant now refers to apparently conceding that Mr. Peterson referred to a short-term situation. Throughout its briefing, it referred to Mr. Peterson asserting it was a short-term condition. That is the issue. It wasn't a short-term condition, depression. The record establishes that's at least two years through the present. For the record, that's permanent. How does Verizon know that it's two years? It doesn't. But it doesn't get off the hook by saying we never asked, we never investigated. At the time of his depression's onset, it's only lasted two months, so we get to treat it as a short-term impairment? Well, you're asking that rhetorically, but I'm wondering if that isn't true. Under Burnett, if they know he's disabled, there's an interactive process. But if they don't have sufficient evidence to conclude that he has a disability, then what precedent would make the interactive process kick in? The interactive process is he's done the minimum necessary. He's asserted, I have a medical condition, and he's requested a modification. If Verizon takes it. But what is that? Where is he indicated that he's got a medical condition of sufficient duration to be a disability under the ADA? Well, that's what part of the interactive process would have determined. If Verizon's position is you don't get this leave, you're not disabled, your depression isn't severe enough or long-term enough, you've only been suffering it from two months, then he would have had the opportunity to present documentation as Verizon has a right to request. But they never engaged in the interactive process. They never gave him the opportunity. What's the case that says that they have to engage in that before he shows a sufficient duration of a problem to be a disability? I don't know that there is a case of that. I know that Barnett establishes that he only needs to identify a medical condition and request a modification, which he did in this case, to trigger the interactive process. My position would be. That was in a case where it was, I think, where it was clear that the person had a disability. And I'd have to go back. I was on that Barnett panel, I think. But I thought that it's dealing with the means for asking. Well, as a hypothetical. Asking for an accommodation. As a hypothetical, Judge, I guess the question you're posing is, as a matter of law, is a person who suffers an onset of acute depression, which lasts indefinitely, is permanent. You're over time with that. I think we have the argument. We'll have to look at the cases. Very good. Thank you. We thank both counsel for this well-argued argument. And the case is submitted.
judges: Fisher, Gould, Bea